STOKER, Judge.
In this case we consider the correctness of a jury verdict which awarded $480,000 in damages for breach of contract and fraud against Beauregard Federal Savings Bank (BFSB) and two of its officers, Cecil Middleton (Middleton)[1] and Carroll Green (Green). Middleton was president and chairman of the board and Carroll A. Green was vice president and CEO of the bank. The defendants appealed the judgment on numerous grounds, and the plaintiffs, Charles D. Green and Belinda Ann Green, appealed asserting that the jury erred in *1352 failing to award them damages for nonpe-cuniary losses. (In this opinion Carroll Green, one of the defendants bank officers as pointed out above, is referred to as Green; because the plaintiffs are also named Green, we refer to Charles D. Green simply as the “plaintiff” and to both plaintiffs as “plaintiffs.”)
THE CONTROVERSY
The controversy in the matter grows out of an agreement by the bank (BFSB) to loan money to the plaintiffs for the purpose of purchasing land which the plaintiffs proposed to develop and on which plaintiffs would build houses for sale. The property belonged to a party named Jack Waddle who owed BFSB money. Waddle contemplated going into bankruptcy and attempted to interest plaintiff, Charles D. Green, in purchasing the property. Plaintiff was interested in purchasing the property but took the position that he could not purchase the property and develop it because he would have to be financed to the extent of 100%. BFSB offered to give plaintiffs 100% financing. From this offer a general agreement between BFSB and plaintiff came about which forms the so-called contract which plaintiff contends was breached by the defendants.
The understandings between the parties were loose, informal, imprecise, and were not memorialized in writing except for several points embodied in what purported to be a commitment letter. (Evidence Exhibit P-6). Middleton and Green were quite sympathetic to the purchase of the Waddle property so that the Waddle loan to BFSB could be liquidated before Waddle declared bankruptcy, and for that reason urged plaintiff to advise them of his needs. Plaintiff hurriedly prepared a handwritten set of notes which indicated his immediate needs. Plaintiff’s needs contemplated two phases, the immediate needs (characterized by the plaintiff as the “short-run”) and funds for the construction of houses on the Waddle property for sale at a profit (“the long run”).
As immediate needs plaintiff estimated the sum of $195,000 which would include $98,600 needed to pay off the Waddle loans and delinquencies, costs to improve the property with street and drainage facilities, costs to improve two existing houses on the property for resale, and costs of surveying, and leveling and clearing the land. However, plaintiffs handwritten notes indicated that by sale of the existing houses and other portions of the property, plaintiff could realize $138,000 which would reduce his “immediate needs” to $57,000. To put it another way, plaintiff was saying in effect “loan me enough to buy the property and put in streets, but I will reduce my costs by the incidental sales and will wind up with a net need of $57,000 on the short-run phase of the project.”
On the basis of this presentation, the bank officers approved the deal and immediately loaned plaintiff in excess of $100,-000, and plaintiff purchased the Waddle property. The property consisted of seven and one-half acres with improvements, and plaintiffs paid $101,904.10 for the property.
The closing described above took place on April 16, 1984, and at that time plaintiff asked for a commitment letter from the bank. Carroll A. Green gave plaintiff the following commitment letter:
April 16, 1984
Mr. Charles David Green
P.O. Box 227
DeRidder, LA 70634
Dear Charles:
This is to confirm our agreement to you to extend credit for the development and construction of your proposed subdivision on lots 58 and 60 of Long-Bell Farm Land at an interest rate of 12%.
We will make loans to you at 12% for the construction of these houses on no more than six (6) at one time.
This commitment shall be good for a period of two years from date of this letter.
Sincerely,
/s/ Carroll A. Green
Carroll A. Green
CAG/mb
This commitment letter refers to the long range plans of plaintiff to build homes on *1353 the seven and one-half acres. Significantly, the letter makes no mention of how much BFSB agreed to lend. There is no statement of limitation as to the amount of funds the bank would lend. However, Carroll Green asked plaintiff how much he was going to need in a credit line, and plaintiff stated that he would need $400,000 “to get the new subdivision started.” Middleton and Green took the matter to the Board of Directors of BFSB on April 11, 1984 which approved a number of loans “subject to complying with our prudent Underwriting Standards.” Charles David Green was approved for a $400,000 loan, but the minutes showed an addition with reference to plaintiffs loan reading “The maximum for new subdivision.”
Charles Green asserts that Green advised him that the two-year limitation in the commitment letter was inserted merely for the purpose of complying with regulations, and in fact BFSB made loans beyond the two-year period. Plaintiff testified that no one ever advised him that his loan limit was $400,000, and there is no testimony or evidence to the contrary. The apparent position of the plaintiffs in this law suit is that the commitment letter was open-ended and subject to no limitations at all. Plaintiff claims that the first indication he had that there was any limitation was on February 27, 1987, when BFSB refused to loan plaintiff any further funds for the construction of houses in his subdivision.
Between April 16, 1984, and September 30, 1986, BFSB loaned plaintiff $687,624. The largest amount plaintiff ever owed at any one time was in excess of $400,000. Over the years BFSB became increasingly disenchanted with plaintiffs’ handling of their subdivision project. As a result, BFSB urged more productive action and placed restrictions on loans to plaintiffs in accordance with what the bank considered good banking practice. BFSB became convinced that plaintiffs would not be able to make a go of the subdivision project and refused to lend them any more funds.
Ultimately, BFSB brought foreclosure proceedings against Charles D. Green and Belinda Ann Green and then sought a deficiency judgment, and that matter is a separate appeal on the docket of this court numbered 91-308.
THE LAW SUIT
Plaintiffs, Charles D. Green and Belinda Ann Green, filed their law suit in this action on February 25, 1988, which was prior to the time BFSB filed its foreclosure suit. (The foreclosure suit was filed on June 16, 1988.) The plaintiffs named as defendants Beauregard Federal Savings Bank, Cecil R. Middleton and Carroll A. Green.
Allegations of Plaintiffs’ Petition
In a lengthy petition plaintiffs recite the history of their dealings with the defendants concerning the financial dealings described above. Plaintiffs characterize the conduct of Middleton and Green in the fulfillment of the agreement to finance their real estate venture as fraudulent, deceitful, and as carried out in bad faith. Plaintiffs allege that defendants’ action so interfered with the development of their project, largely through delay in advancing loan funds and demanding additional collateral, that defendants caused plaintiffs to be “demeaned, humiliated, and almost completely destroyed, both financially and emotionally.” Plaintiffs further alleged that defendants “were in a fiduciary or special relationship with the Plaintiffs and, due to the course of dealings established between the parties, Defendants had a duty of good faith and honorable dealing to the Plaintiffs, which duty was breached as herein-above outlined, resulting in all damages herein set forth.”
Plaintiffs prayed for compensatory damages, exemplary damages, damages for mental and emotional distress, release of all collateral held by defendants, attorney’s fees and a trial by jury.
Defendants’ Pleadings
The defendants answered the petition setting forth their defense and, alternatively, setting forth the claim that “plaintiffs were contributorily negligent in failing to mitigate their losses, in undertaking speculative ventures when it was imprudent and unsure to do so, and in failing to conduct themselves as reasonably prudent develop *1354 ers.” Therefore, defendants plead in the alternative that comparative fault principles should be applied.
The first defense plead was that the petition failed to state a cause of action; the second defense asserted pleas of prescription of one, three and ten years. The trial court overruled the pleas of prescription. The third defense consisted largely of a general denial but with an acknowledgment of the commitment letter of April 16, 1984 signed by Carroll A. Green and an averment that this letter constituted the entirety of the agreement of BFSB with plaintiffs.
Trial Court Action
Following presentation of the evidence and jury instructions, the court submitted the following jury interrogatories to the jury which the jury answered as indicated:
THIRTY-SIXTH JUDICIAL DISTRICT COURT
STATE OF LOUISIANA
PARISH OF BEAUREGARD
CHARLES C. GREEN AND BELINDA ANN GREEN VERSUS BEAUREGARD FEDERAL SAVINGS BANK, CARROLL A. GREEN AND CECIL R. MIDDLETON
SUIT NO. 88-159
DIVISION “C”
SPECIAL JURY INTERROGATORIES
1.Did a contractual relation exist between Charles Green and Belinda Green and Beauregard Federal Savings Bank?
Yes No
2.Do you find that Carroll Green and Cecil Middleton are officials of the Beauregard Federal Savings Bank?
/
Yes No
3.Do you find that the actions of Cecil Middleton tortiously caused a breach of this contractual relation between Beauregard Federal Savings Bank and Charles and Belinda Green?
/
Yes No
If your answer to #3 is No, then skip to # 6.
4. Do you find that such breach by Cecil Middleton was the legal cause of damages to Charles and Belinda Green?
/
Yes No
5.What degree of such breach is attributable to Cecil Middleton? 5%
6.Do you find that the actions of Carroll Green tortiously caused a breach of this contractual relation between Beauregard Federal Savings Bank and Charles and Belinda Green?
/
Yes No
7.Do you find that such breach by Carroll Green was the legal cause of damages to Charles and Belinda Green?
/
Yes No
*1355 8.What degree of such breach is attributable to Carroll Green?
10%
9.Do you find that such actions of Cecil Middleton or Carroll Green were done as official representatives of Beauregard Federal Savings Bank?
/
Yes No
10.Do you find that such actions of Cecil Middleton and Carroll Green as officials of Beauregard Federal Savings Bank tortiously interfere with the contract between Charles and Belinda Green and Beauregard Federal Savings Bank?
/
Yes No
11.What degree of such breach is attributable to Beauregard Federal Savings Bank?
80%
12.Do you find that Charles or Belinda Green were at fault in the breach of contract with Beauregard Federal Savings Bank?
/
Yes No
13.Do you find that such action by Charles or Belinda Green legally contributed to any damages they suffered?
/
Yes No
If your answer is yes, then answer # 14.
14.What degree of such breach is attributable to Charles and Belinda Green? 5%
TOTAL DAMAGES SUFFERED BY CHARLES AND BELINDA GREEN TOTAL: $380,000
If your answer is No to #3, #6 and # 10, your verdict shall be for the defendants.
If your answer is Yes to # 3, # 6 or # 10, complete all of the appropriate Interrogatories.
(s) Alan P. Dunbar
JURY FOREPERSON
Date August 23, 1990
It is noteworthy that the jury found the plaintiffs to be guilty of fault in causing their damages to the extent of 5%. The trial judge gave judgment in accordance with the verdict apportioning the damages as follows:
*1356 Beauregard Federal Savings Bank $304,000
Carroll Green 38,000
Dorothy Thompson Middleton 19,000 (Successor to her husband Cecil Middleton)
ARGUMENT AND DISCUSSION
The plaintiffs’ petition is lengthy and so is their initial brief, forty legal size pages not including attachments. Defendants’ brief consumes seventy-nine pages, not including attachments.
As we appreciate the plaintiffs’ case it is that they accuse the officers of BFSB of having tortiously induced plaintiffs to undertake the real estate purchase and development, promising full and unlimited financing, and then willfully withholding the promised funds with the result that their project failed and resulted in plaintiffs’ financial ruin and emotional distress. It is apparent that plaintiffs accuse the officers, Middleton and Green, of having tortiously interfered with their contract with BFSB. Inasmuch as the jury found for the plaintiffs (at least to the extent of 95%), we are mindful that our standard of review, the manifest error-clearly wrong rule, must be conducted under the criteria set forth in Rosell v. ESCO, 549 So.2d 840 (La.1989) and the line of cases which preceded it and those in which the Louisiana Supreme Court has elaborated on it since.
Issues
Despite the length of the jury interrogatories, the manner in which they are couched does not give any clue as to what the jury concluded were the specific facts of the case. The interrogatory answers, conclusory in nature, do not tell us what the contract was or what the defendants did to breach the contract or to defraud the plaintiffs.

What was the contract?

The jury found that a contractual relationship existed between plaintiffs and BFSB. Preliminary to a discussion of a contract breach (or an interference with the contract) it is necessary to define or determine what the contract was. The defendants contend that the only agreement between the parties was the April 16, 1984, so-called letter of commitment. We agree.
The commitment letter is very limited, and in fact only expresses a general intent. The letter omits any commitment to any amount to be loaned, or to a loan limit. It is questionable that the commitment letter expresses an obligation which could be legally enforced. On the other hand, the plaintiffs take the position that the amount to be loaned was unlimited and that they were unaware of any limitation until February 27, 1987, when BFSB refused to advance any more funds. Such an assumption was unwarranted. Nevertheless, on the suggestion of Charles D. Green that he needed $400,000 to get started, the bank’s board authorized a loan of that amount. Plaintiff contends he was never given a limitation of $400,000, and the defendants have no evidence that they did give plaintiff a limit. Nevertheless, we consider it unreasonable, especially for a businessman, to believe that he was entitled to draw unlimited funds under the terms of the commitment letter.
Beyond the fact that BFSB did not contract to lend plaintiffs any specific amount of financing, other factors are significant with regard to the alleged breach of contract. The first fact is that BFSB did in fact lend the plaintiffs a highly substantial amount of money. As noted above, BFSB advanced the total sum of $687,624 during the period between April 16, 1984, (the date of the issuance of the commitment letter and the initial loan) and September 30, 1986. At one particular point, the amount advanced exceeded $400,000.
From the analysis given above, we find no support for the jury’s finding the defendants breached an agreement to loan funds to plaintiffs to acquire the Waddle land, develop it as a subdivision and build and sell houses on the lots created for profit. Therefore, we must look to other facts to determine if plaintiffs proved a cause of action in some other manner.
Could defendants have breached the contract in some other way, or did the two officers interfere with the contract in any way?

*1357
Did the defendants “tortiously” interfere with plaintiffs’ contract rights?

The long recitation of alleged wrongs in plaintiffs’ petition, the evidence presented and the charges leveled in their brief filed in this court may be summarized as follows. Plaintiffs’ real estate venture evidently did not progress as plaintiffs hoped. Plaintiffs lay the blame on defendants. The blame, in plaintiffs’ view, lay in the failure of defendants to cooperate and advance funds as plaintiff felt they were required. Defendants delayed advances or demanded additional collateral. Defendants expressed lack of confidence in the success of plaintiffs’ venture. Defendants refused to allow plaintiffs to apply the proceeds of house sales to the payment of suppliers and other lien holders and insisted that the proceeds be applied to interest and principal on the plaintiffs’ outstanding loans.
Plaintiffs complain bitterly of a $75,000 advance which Green had approved which the bank mishandled in numerous ways so as to cause their bank account to be short and cause checks on the account not to be honored. Plaintiffs refer to the displeasure of Carroll Green when he learned that plaintiff, Charles D. Green, used some of the funds loaned to buy a truck which plaintiff felt was necessary and incidental to the conduct of his operations. The plaintiffs seem to feel that they were “taken-in” in some way by the deteriorated condition in which they found the Waddle house which required additional funds to bring it up to a saleable condition.
It is evident that relations between the two bank officials and plaintiffs chilled as time went by. However, with all due respect to the plaintiffs and the jury, we are unable to read the record to find any basis for plaintiffs’ claim that the defendants, particularly Middleton and Green, were guilty of any tortious conduct which hindered or rendered more difficult the development of plaintiffs’ property or turning it into a profitable venture. These officials were responsible to the bank and owed the bank the duty to supervise the loan advances so as to protect the banks investment. At times, these officials might have been more lenient, but their first responsibility was to BFSB.
The briefs of both parties contain discussion by the Louisiana Supreme Court case of 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228 (La.1989) concerning the action for intentional interference with contractual relationship. After considering this case and other authorities, we find nothing in the record from which the jury could have properly concluded that Middleton and Carroll A. Green were guilty of conduct which might be considered tortious interference of contract relations with BFSB. In our opinion, none of the actions of Middleton and Green of which plaintiffs complain amount to wrongful acts. In all instances they were acting in good faith and serving the best interests of their corporate employer. While we do not find these officer’s actions to constitute wrongs, we find the following from 9 to 5 Fashions, Inc. v. Spurney to be pertinent:
“Interference with contract, which had its modern inception in malice has remained almost entirely an intentional tort; and, in general, liability has not been extended to the various forms of negligence by which performance of a contract may be prevented or rendered more burdensome. See W. Prosser & P. Keeton, The Law of Torts § 129 p. 997 (5th ed. 1984). In addition to the reasons given for the general policy against recovery based on negligence, Id. p. 1001, there are strong reasons that corporate officers should enjoy immunity from liability for negligent contractual interference as well as from liability for intentional interference committed within the scope of corporate authority for the corporation’s benefit. Since officers owe fiduciary obligations to the corporation and its shareholders and hold policy making positions, their fidelity and freedom of action aimed toward corporate benefit should not be curtailed by undue fear of personal liability. See La.R.S. 12:226; Avins, supra, Perlman, supra. However, the officer’s privilege should not be absolute, it should be limited by the purpose for which it is granted, i.e., to allow him *1358 to fully perform his fiduciary duty as authorized by his corporation. When the officer’s action is detrimental to the corporation or outside the scope of his authority, the officer should be responsible for his intentional acts of interference with the contract rights of another. Av-ins, supra; cf. Glazer v. Com. on Ethics, 431 So.2d 752 (La.1983); 3 W. Fletcher, Cyclopedia of the Law of Private Corporations § 1001 (1986).”
538 So.2d at page 232.
Contrary to the allegations of plaintiffs’ petition, the fiduciary obligation owed by Middleton and Green was to BFSB. Their actions were not detrimental to the interests of the bank or outside the scope of their authority as officers of the bank. Their dealings with the plaintiffs were for the purpose of protecting the bank’s interest, and the record does not establish that these officers did anything which could be construed as intentional or unjustified interference with BFSB’s commitment to finance construction of houses in plaintiffs’ subdivision. For these reasons we have no hesitancy in finding that the jury committed manifest error and were clearly wrong in their findings that Middleton and Green tortiously interfered with any contract relations with BFSB.
CONCLUSION
The facts of this case are not in dispute. Determination of the facts do not turn on credibility evaluations of witnesses. The dispute between the parties and the validity of plaintiffs’ claims are to be resolved by a determination of the legal import of the facts, that is to say, how the facts are to be interpreted. The plaintiffs interpret the facts as showing invidious motivation of the defendants to harm them and to frustrate their efforts to make a financial success of their land development and speculative house building operation. The jury evidently agreed.
In our opinion, the interrogatories presented to the jury consisted largely of mixed questions of fact and law. It is our conclusion that the jury’s legal determinations are incorrect.
We find it unreasonable for plaintiffs to have expected that BFSB would extend them unlimited credit or that extension of loans would not be subject to reasonable business related restrictions. It would seem that lenders of funds to finance speculative ventures such as plaintiffs were engaged in should have the privilege of monitoring the conduct of operations and conditioning their extensions of credit on the lenders’ appraisal of prudent conduct in direction of the ventures.
In summary, BFSB loaned plaintiffs a large sum of money over several years, not limited to their two-year commitment. The sum approached the plaintiffs’ largest estimate of their ultimate needs.[2] BFSB was entitled to cease loaning funds upon the reasonable belief that plaintiffs were not going to make a go of their venture. We do not find that the bank officers’ conduct was calculated to tortiously interfere with the agreement with BFSB. We find no fraud was practiced on plaintiffs. Consequently, we find that BFSB did not breach any contract to loan plaintiffs funds for their real estate venture, and further, that no fraud was practiced on them. Defendants Middleton and Green were not guilty of tortious interference of contract.
Just before oral argument, defendants filed a supplemental brief on the issue of damages which was strongly opposed by plaintiffs who filed a motion to strike the brief. Following oral argument defendants filed an additional brief concerning the application of LSA-R.S. 6:1124 (Acts 1991, No. 581), an issue they had also raised in oral argument. Plaintiffs vigorously oppose the filing of these briefs and urge us to strike them as being a violation of the court’s rules. In view of our holdings in this case, based on the record and the origi *1359 nal briefs, we find it unnecessary to address the issue of the supplemental briefs and have not considered them.
DISPOSITION
For the reasons given above, the judgment of the trial court is reversed and set aside and
It is now ORDERED, ADJUDGED and DECREED that there be judgment herein in favor of defendants Beauregard Federal Savings Bank, Dorothy Thompson Middleton (legal successor of Cecil R. Middleton) and Carroll A. Green rejecting the demands of plaintiffs, Charles D. Green and Belinda Ann Green.
The costs of this appeal and the costs incurred in the trial court shall be paid by plaintiffs-appellees.
REVERSED.

. Cecil Middleton died prior to the trial on the merits. His widow, Dorothy T. Middleton, subsequently represented his estate in this suit.

. When Carroll Green asked Charles D. Green what credit line he needed, Charles D. Green demurred because he had not yet figured it out. Carroll Green said he would need to have a figure to take to the Board of the bank. In response, plaintiff stated "I don’t know if it would be five, six. I don’t know what it would be.” When pressed plaintiff stated it would take $400,000 just to get started.